IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JEANIE L. NICHOLAS, | ) | CASE NO. 5:17-CV-2558 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Jeanie Nicholas ("Nicholas") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Commissioner") denying her application for

disability insurance benefits ("DIB"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C.

§ 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the

parties. Doc. 13.

For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

Nicholas filed her application for DIB in May 2014, alleging a disability onset date of

June 13, 2013. Tr. 53, 151. She alleged disability based on the following: rheumatoid arthritis,

right hip pain and back disc problems for over ten years, chronic fatigue syndrome, depression,

chronic hepatitis C diagnosed in 1997, opiate addict for over ten years, and "foggy brained due to

rheumatoid, chronic fatigue and meds." Tr. 155. After denials by the state agency initially (Tr.

64), and upon reconsideration (Tr. 77), Nicholas requested an administrative hearing (Tr. 88). A

hearing was held before an Administrative Law Judge ("ALJ") on October 20, 2016. Tr. 28-52.

In his November 3, 2016, decision (Tr. 11-22), the ALJ determined that there are jobs that exist

in significant numbers in the national economy that Nicholas can perform, i.e. she is not disabled. Tr. 21. Nicholas requested review of the ALJ's decision by the Appeals Council (Tr. 127) and, on October 13, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Nicholas was born in 1971 and was 42 years old on the date she filed her application. Tr. 53. She last worked as a waitress in 2014. Tr. 40.

### B. Relevant Medical Evidence[1]

From August 2012 through March 2014, Nicholas received treatment at a pain management clinic for a history of chronic back and hip pain. E.g., Tr. 317, 251. She also reported joint pain, stiffness, and swelling. E.g., Tr. 252, 318. She received prescriptions for MS Contin and acetaminophen/hydrocodone. E.g., Tr. 252, 319. Physical exams showed normal extremity strength and a normal gait. E.g., Tr. 251, 319. Nicholas stopped pain management and sought treatment for opioid dependence in March 2014. Tr. 837.

In July 2013, Nicholas saw her primary care physician Richard W. Jones, M.D., for a follow up of her complaints of pain. Tr. 879. Upon exam, her left shoulder was "exquisitely tender" and had a painful and decreased range of motion. Tr. 880.

On April 15, 2014, Nicholas saw Dr. Jones complaining of intermittent joint pain. Tr. 876. She did not have pain that day, but she said that her knees, shoulders, toes, fingers, and feet were "locking up" for days at a time. Tr. 876. Her symptoms included joint pain, joint redness and warmth in her fingers and toes at times, trouble walking due to foot pain, joint swelling at

---

[1] Nicholas only challenges the ALJ's findings regarding her physical impairments. Accordingly, only the medical evidence relating to these impairments is summarized and discussed herein.

times, stiffness, and decreased range of motion.  Tr. 876-877.  Her pain had at times reached 10

out of 10.  Tr. 876.  Upon exam, she had moderate tenderness in her shoulders.  Tr. 877.

Laboratory testing showed a positive rheumatoid factor.  Tr. 874.  Dr. Jones assessed rheumatoid

arthritis and referred her to a rheumatologist, Dr. Vellanki.  Tr. 875.

On May 8, 2014, Nicholas saw Padma Vellanki, M.D.  Tr. 325-331.  She reported that

her right shoulder had locked on June 13, 2013, which lasted for three to four days, and then

similar symptoms occurred in her left shoulder a month later.  Tr. 325.  Over the prior weeks, she

began noticing stiffness and aching in her hands, elbows, knees, hips, and feet.  Tr. 325.  She had

difficulty carrying trays at her waitress job and had to call off several times.  Tr. 325.  She had

trouble doing chores at home and her daughters were helping her.  Tr. 325.  She endorsed

fatigue, fever, and weakness.  Tr. 325.  Upon exam, she had no edema; tenderness and swelling

in her third PIP joint in her right hand and tenderness in her third PIP joint in her left hand; and

5/5 grip strength.  Tr. 327-328.  She had tenderness in her elbows and pain with range of motion

in her left elbow and otherwise had normal bilateral upper extremities.  Tr. 328.  She had

tenderness in her ankle and toe joints and otherwise normal lower extremities.  Tr. 328.  She had

a normal gait and station, normal spine and ribs, and no neurological motor tender points.  Tr.

328-329.  Dr. Vellanki assessed seropositive rheumatoid arthritis ("RA") with synovitis in the

hands, elbows, ankles, and feet, and intermittent synovitis in the shoulders, hips, and knees.  Tr.

329.  She prescribed prednisone.  Tr. 329.

On May 15, 2014, Nicholas saw Dr. Jones for a recheck of arthritis/joint pain.  Tr. 872.

She rated her current pain a 5 out of 10.  Tr. 872.  Dr. Jones advised she follow up with

rheumatology, exercise to stay healthy, and keep off work for the rest of the week.  Tr. 873.

On May 28, Nicholas followed up with Dr. Vellanki. Tr. 332. Her laboratory workup showed a strongly positive rheumatoid factor. Tr. 332. Her exam findings were the same as her prior visit. Tr. 333-334. Dr. Vellanki began her on Methotrexate. Tr. 334.

On June 26, Nicholas returned to Dr. Jones for a recheck of pain. Tr. 351. She reported severe pain in her heels. Tr. 351. Upon exam, she had tenderness in her posterior talofibular ligament and Dr. Jones referred her to an orthopedist. Tr. 352.

On October 20, Nicholas had an initial consultation with A. Harris Basall, M.D., at the Pain Management Institute. Tr. 414. She reported a history of low back pain since 1997. Tr. 414. She also complained of radicular symptoms on the right more than the left. Tr. 414. She said she had an MRI sometime in the past and was told she had a pinched nerve. Tr. 414. She said her activities of daily living had declined and pain disrupted her sleep pattern. Tr. 414. Upon exam, she had facet tenderness in her lumbar spine, right more than left, no lower extremity sensory or motor deficits, and absent reflexes. Tr. 416. Dr. Basall gave her an epidural steroid injection in her lumbar spine and referred her to physical therapy. Tr. 416.

On October 28, Nicholas returned to Dr. Vellanki. Tr. 380. She tolerated Methotrexate without any problem and felt that it helped. Tr. 380. She continued to notice some stiffness and aching in her feet and reported difficulty walking for prolonged periods. Tr. 380. She did not have any more locking of her joints. Tr. 380. She had to take breaks while doing chores at home. Tr. 380. Upon exam, she had a normal gait and station, 5/5 grip strength, and tenderness in her left elbow, bilateral ankles, and bilateral toes. Tr. 381-382. X-rays of her lumbar spine showed diffuse degenerative facet disease and no evidence of spondylolsis. Tr. 389. X-rays of her hips were normal. Tr. 391, 393. Dr. Vellanki concluded that she had seropositive anti-ccp

rheumatoid arthritis with mild synovitis in the ankles and feet. Tr. 383. She continued Nicholas' Methotrexate and added Plaquenil. Tr. 383.

Nicholas started physical therapy for her low back pain radiating to her hip on November 6, 2014. Tr. 395. At her initial session, she reported having had back pain for years and becoming addicted to her pain medications; she was no longer taking them. Tr. 395-396. She had short-term improvement in her back pain following a lumbar injection 10 days prior and her pain was a 2 to 4 out of 10. Tr. 395. Her pain was worse with sitting more than 15-20 minutes, walking more than 15 minutes, and activity in general. Tr. 395. She was applying for disability and could tolerate intermittent light household activities depending on how her RA was acting. Tr. 395. She said she could not move her right arm that day because it was locked up. Tr. 395.

Nicholas attended six sessions of physical therapy and missed several sessions due to flare-ups of RA affecting her joints and functional mobility. Tr. 398. The physical therapist agreed to discontinue therapy on December 17 and to let Nicholas work on her home exercise program at her own pace until she could get her new RA medications working better. Tr. 398. That day, the therapist observed that Nicholas walked with stiff knees due to RA swelling and pain in knees. Tr. 398. The therapist wrote, "At this time, I feel that Jeanie is not able to effectively participate in therapy due to her RA symptoms." Tr. 399.

On January 14, 2015, Nicholas returned to Dr. Jones for a recheck of her anxiety. Tr. 868. She complained of anxiety, difficulty concentrating, fatigue, insomnia, irritability, muscle tension, panic attacks, and sleep disturbance. Tr. 868. Dr. Jones started her on Paxil and Xanax. Tr. 869.

On February 16, Nicholas told Dr. Jones that she did not think her Paxil and Xanax were working, although she generally felt well with minor complaints. Tr. 866. She reported joint

pain and stiffness and muscle pain and weakness. Tr. 866. Dr. Jones increased her Xanax. Tr. 867.

On March 2, Nicholas saw Dr. Vellanki for a follow up. Tr. 811. She complained of more stiffness and achiness of her hands and feet and difficulty walking for prolonged periods of time. Tr. 811. She also reported locking of her joints. Tr. 811. She was unable to take Plaquenil due to abdominal bloating and cramping. Tr. 811. Upon exam, she had tenderness in all PIP and MCP joints in her hands, 5/5 grip strength, left elbow pain with extension and flexion but otherwise normal upper extremity examination, tenderness in her right and left ankles and toes, a normal gait and station, and a normal range of motion in her spine and hips. Tr. 812-813. Dr. Vellanki diagnosed seropositive, anti-ccp rheumatoid arthritis with synovitis in hands, ankles and feet. Tr. 814. She continued Nicholas' Methotrexate and started her on Enbrel. Tr. 814, 750.

On March 18, Nicholas followed up with Dr. Jones regarding anxiety, depression, and disability forms. Tr. 863. She reported fatigue, arm pain and weakness, elbow pain, foot pain, hand pain, knee pain, leg pain and weakness, shoulder pain, and wrist pain. Tr. 864. Upon exam, she had exquisite tenderness over her hands and wrist joints. Tr. 864. Dr. Jones noted that her RA seemed to be getting a little worse and diagnosed her with hand weakness secondary to RA. Tr. 865.

On April 29, 2015, Nicholas returned to Dr. Basall at the Pain Management Institute. Tr. 806. She reported an 80% improvement in her back pain for about 3 months following her last injection. Tr. 806. Her current pain was 5/10. Tr. 806. Upon exam, she had moderate tenderness to lumbar spine palpation, normal sensation, absent reflexes, and normal motor strength. Tr. 807. Dr. Basall gave her a lumbar epidural steroid injection. Tr. 807.

On May 5, Nicholas followed up with Dr. Vellanki.  Tr. 750.  She reported extreme fatigue following an Enbrel injection.  Tr. 750.  She reported more stiffness and achiness in her hands, elbows, shoulders, knees and feet; difficulty with handgrip; trouble walking for any length of time; stiffening up with sitting more than a half hour; and intermittent locking of her right hip. Tr. 750.  Upon exam, she had tenderness in all PIP and MCP joints in her hands, 5/5 grip strength, a normal gait and station, pain and joint tenderness in her bilateral elbows and shoulders, pain with shoulder abduction and internal rotation, tenderness in her knees, ankles, and toes, pain with knee flexion, and a normal range of motion in her spine and hips.  Tr.  75. Dr. Vellanki diagnosed seropositive, anti-ccp rheumatoid arthritis with mild synovitis in hands, elbows, shoulders, knees and feet and prescribed Humira injections.  Tr. 753.

On May 22, Nicholas followed up with Dr. Vellanki and reported no adverse side effects from Humira.  Tr. 756.  Her physical exam findings remained unchanged.  Tr. 758.  Dr. Vellanki diagnosed RA with mild synovitis in the hands, elbows, shoulders, knees, and feet and continued her medications.  Tr. 759.

On June 17, Nicholas saw Dr. Jones for a follow up and felt well with minor complaints. Tr. 860.  She reported joint pain, stiffness, swelling, muscle weakness, decreased range of motion, anxiety and depression.  Tr. 860.

On June 25, Nicholas saw Dr. Basall and received another lumbar epidural steroid injection.  Tr. 797-798.

On July 14, Nicholas saw Dr. Vellanki for a follow up and reported that she had been able to function better on Humira.  Tr. 762.  Upon exam, she had tenderness in all PIP and MCP joints in her hands, 5/5 grip strength, a normal gait and station, pain and joint tenderness in her shoulders, pain with shoulder abduction and internal rotation, tenderness in her ankles and toes,

and pain with adduction of her hips. Tr. 763-764. Dr. Vellanki assessed RA with mild synovitis in hands, shoulders, hips and feet and continued her current medications. Tr. 765.

On August 19, Nicholas told Dr. Jones that she felt well with minor complaints of decreased energy and pain. Tr. 855. She was sleeping well and her appetite was normal. Tr. 855. She wanted something to help her lose weight and Dr. Jones counseled her on diet and exercise. Tr. 855-856. She had a large red abscess under her right arm and Dr. Jones prescribed antibiotics. Tr. 855-856. Nicholas returned six days later to discuss lab results and reported weakness, fatigue, and weight gain over the last week. Tr. 852-853. Dr. Jones again counseled her on a healthy diet and exercise. Tr. 853.

On September 29, Nicholas followed up with Dr. Basall and reported significantly reduced pain (85% improvement) following her last lumbar injection. Tr. 794. She rated her current pain a 5/10. Tr. 794. Prolonged sitting, prolonged standing, walking, climbing stairs, and lifting heavy weight exacerbated her pain. Tr. 794. Upon exam, she had normal sensation and motor exam. Tr. 795. She received another lumbar epidural steroid injection. Tr. 792.

On October 14, Nicholas followed up with Dr. Vellanki. Tr. 768. She reported that she had had an abscess from a possible spider bite that was drained and for which she received IV antibiotics, and advised that she had been off her Methotrexate and Humira for about a month. Tr. 768. She reported feeling achy all over and having more stiffness and soreness in her hands, hips and feet. Tr. 768. Upon exam, she had tenderness in her finger joints, 5/5 grip strength, an otherwise normal upper extremity examination, tenderness in her ankles and toes, pain with abduction of her hips, and a normal gait and station. Tr. 770. She had tender points across her upper back, lower back, arms, forearms, hips, thighs, and calves. Tr. 771. Dr. Vellanki assessed RA with synovitis in hands, hips, and feet with coexisting fibromyalgia. Tr. 771.

On January 22, 2016, Nicholas told Dr. Vellanki that she felt achy all over and had been out of Humira for about three weeks.  Tr. 774.  Physical exam findings remained unchanged.  Tr. 775-776.  Dr. Vellanki refilled Nicholas' medications.  Tr. 777.

On May 25, 2016, Nicholas returned to Dr. Vellanki.  Tr. 781.  She reported that she went to the emergency room for right upper quadrant pain in early May.  Tr. 781.  Upon exam, she had tenderness in her finger joints, 5/5 grip strength, an otherwise normal upper extremity examination, tenderness in her knees, ankles and toes, pain with abduction of her hips, and a normal gait and station.  Tr. 783.  She had tender points across her upper back, lower back, arms, forearms, hips, thighs, and calves.  Tr. 783.  Dr. Vellanki diagnosed RA with synovitis in hands, hips, knees, and feet and coexisting fibromyalgia.  Tr. 784.  She started Nicholas on Gabapentin.  Tr. 784.

On June 16, Dr. Basall gave Nicholas a lumbar epidural steroid injection.  Tr. 789.

On August 23, Nicholas saw Dr. Vellanki for a follow up.  Tr. 888.  Upon exam, she had tenderness in her finger joints, 5/5 grip strength, an otherwise normal upper extremity examination, tenderness in her knees, ankles, and toes, pain with abduction of her hips and flexion of her knees, and a normal gait and station.  Tr. 890.  She had tender points across her upper back, lower back, arms, forearms, hips, thighs, and calves.  Tr. 891.  Dr. Vellanki diagnosed RA with synovitis in hands, hips, knees, and feet and coexisting fibromyalgia.  Tr. 891.  She increased her Gabapentin and continued her Methotrexate and Humira.  Tr. 891.

**C. Function Report**

On July 7, 2014, Nicholas completed a Function Report, stating that RA caused her joints to swell and lock.  Tr. 166.  What she does during the day "depends on what joints are locked": if elbows and shoulders, she could not do much at all; if feet or knees, she could sometimes prepare

a meal but couldn't be up long. Tr. 167. She cooked sometimes and her daughter helped with housework, meals, shopping and driving. Tr. 167. She could not take anything for her swollen joints because she is an addict. Tr. 167. Sometimes her daughter or husband helped her dress and she avoided wearing a bra unless they could hook it for her. Tr. 167. She could feed herself but if her elbows are locked she drinks shakes. Tr. 167. Her husband removed the tub and installed a shower so she could bathe, she cannot shave, and her husband washes her hair when her shoulders or elbows are locked. Tr. 167. She sometimes needs help getting up and down after using the toilet. Tr. 167. She mostly prepares her own simple meals and she cannot cook large meals. Tr. 168. She prepared meals four times a week with her husband's help and it took 5-10 minutes. Tr. 168. She performed limited household chores, such as washing small loads of laundry and light dusting, and could only do these things for 10 minutes when a flare up was not terrible. Tr. 168. Her daughter helped a lot. Tr. 168. She needed help bending when she dropped something or she would just wait for her daughter to do it. Tr. 168.

Nicholas wrote that she goes out 3-4 times a week when her feet are not swollen. Tr. 169. She can go out alone and can drive, although she is limited by what joints are swollen and how much sleep she has had. Tr. 169. She shops online and in stores for 10-20 minutes and only bought 2-3 household items; her daughter or husband bought the groceries. Tr. 169. She could manage her money but had to double check it because her RA gave her a foggy head. Tr. 169. She couldn't lift her grandkids or play with them a lot. Tr. 170. She went out regularly to doctor appointments. Tr. 170. If her arms are locked or swollen she can't lift anything. Tr. 171. She could walk maybe 20 feet before she has to stop and rest. Tr. 171. She has difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, climbing stairs, and

using her hands.  Tr. 171.  Her RA medication makes it difficult to breath.  Tr. 171.  Dr. Jones told her to use a cane, which she does when her feet or knees swell.  Tr. 172.

### D. Medical Opinion Evidence

#### 1. Treating Source

On April 6, 2015, Dr. Vellanki completed a Medical Statement Regarding Inflammatory Arthropathy.  Tr. 808-809.  She noted that Nicholas has a history of joint pain, swelling and tenderness, morning stiffness, synovial inflammation, limited range of motion in joints, and a rheumatoid serum factor.  Tr. 808.  She opined that Nicholas could not ambulate effectively (defined as an "inability to walk a block at a reasonable pace on rough or uneven surface, inability to walk enough to shop or bank, or inability to climb a few steps at a reasonable pace with the use of a single handrail") or perform fine and gross movements effectively (defined as an "inability to prepare a simple meal and feed oneself, inability to take care of personal hygiene, inability to sort and handle papers or files or inability to place files in a file cabinet at or above waist level").  Tr. 808.  At her most recent exam, she had inflammation in her hands, elbows, shoulders, knees, and feet.  Tr. 808.  Dr. Vellanki opined that Nicholas could stand for 15 minutes at a time and sit for 30 minutes at a time; could work one hour per day; lift 10 pounds occasionally and 5 pounds frequently; and occasionally bend, stoop, use her hands for fine and gross manipulation, and raise her arms above shoulder level.  Tr. 808-809.  She wrote that Nicholas had active rheumatoid arthritis that limited her ability to perform work.  Tr. 809.

#### 2. State Agency Reviewing Physicians

On September 23, 2014, Gerald Klyop, M.D., a state agency reviewing physician, reviewed Nicholas' record and opined that she could perform light work (lift and carry 20 pounds occasionally and 10 pounds frequently, stand/walk about 6 hours in an 8-hour workday,

and sit about 6 hours in an 8-hour workday); frequently push/pull with her extremities and perform lateral handling and fingering; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps/stairs; could not climb ladders, ropes, or scaffolds; and could not reach overhead. Tr. 59-61.

On January 21, 2015, state agency reviewing physician Esberdado Villanueva, M.D., adopted Dr. Kylop's findings and added that Nicholas should avoid concentrated exposure to extreme cold. Tr. 72-74.

### E. Testimonial Evidence

#### 1. Nicholas' Testimony

Nicholas was represented by counsel and testified at the administrative hearing. Tr. 30. She testified that her joints lock up at least three times a week due to her rheumatoid arthritis. Tr. 35. When she says "lock up" she means that they are totally immobile. Tr. 35. It lasts, generally, for 3-5 days. Tr. 35. To cope, she uses the heating pad and "the cold [pack], if they're locked completely up," and lies on the couch. Tr. 35-36. The pain in her feet is constant. Tr. 35. She needs a cane for balance and for when her hips, knees and feet lock up. Tr. 35-36. She testified that she has had a cane for two years; Dr. Jones initially asked her if she wanted a prescription for one, but she declined because her mother had an extra cane that she used. Tr. 35. Since then, her cane broke and Dr. Jones wrote her a prescription for one. Tr. 35.

Nicholas takes medication for her RA and it helps. Tr. 36. Before having weekly Methotrexate shots, every joint was locked up on a daily basis: shoulder, ribs, everything. Tr. 36. Her medications cause side effects such as memory loss, balance problems, tremors and brain fog. Tr. 35. After her Humira and Methotrexate shots she feels lethargic and very sleepy for a few days after. Tr. 41-42.

Nicholas' hand problems also stem from her rheumatoid arthritis.  Tr. 36.  Her knuckles swell so bad that her fingers don't move.  Tr. 36.  This happens a couple times a week and the pain and swelling is constant.  Tr. 36.  Her medications don't help her hands much.  Tr. 36.  She has had no other treatment for this problem.  Tr. 36.

Nicholas lives in a house with her husband.  Tr. 34.  She is home alone during the day; almost daily, her adult daughter comes over and helps.  Tr. 39.  When Nicholas was asked if there is anything she does around the house, she stated that she can wipe a kitchen table off and do very light things, depending on what part of her body is locked up.  Tr. 39.  She cooks about once a week, something very simple, depending on what is locked up and how her fingers are.  Tr. 39.  She smokes a few cigarettes a day.  Tr. 39.  She can drive but does not do so often; "probably two times a week."  Tr. 39.  Her driving depends on what doctor appointments she has and whether or not her daughter can take her.  Tr. 39.  She can go to the grocery store by herself to get small items and her daughter and husband do the grocery shopping.  Tr. 40.  She uses a computer to scroll around looking at photos on Facebook and at shopping items.  Tr. 40.  She sees a counselor once a month for her mental health problems; when she first started going, in March 2014, she went three times a week.  Tr. 37.

Nicholas also has difficulty with her personal care.  Tr. 42.  She can brush her hair but can't do anything else with her hair, such as use a curling iron, and when her fingers are locked her husband brushes her hair for her.  Tr. 43.  If her shoulders or hands are locked up her husband or daughter washes her feet, helps her put her undergarments on, and help her wash her hair.  Tr. 43.  She doesn't have to worry about putting socks on because she wears flip-flops due to her toes and heels being so swollen.  Tr. 43.

Nicholas last worked in May 2014 as a waitress.  Tr. 40.  She stopped working because, in March 2014, she stopped taking pain medication and received treatment for opiate addiction.  Tr. 40-42.  Her pain became worse and her arthritis increased; she could not lift and woke up almost daily with her shoulders or knees locked up.  Tr. 41.  Because of her opiate addiction, she cannot take the pain medication she had previously been taking.  Tr. 42.

## 2. Vocational Expert's Testimony

A Vocational Expert ("VE") also testified at the hearing.  Tr. 44-50.  The ALJ asked the VE to determine whether a hypothetical individual of Nicholas' age, education and work experience could perform work if that person had the limitations assessed in the ALJ's RFC determination, and the VE answered that there were jobs such an individual could perform in the national economy.  Tr. 47-47.

## III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his November 3, 2016, decision, the ALJ made the following findings:

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

1. The claimant meets the insured status requirements of the Social Security Act through September 30, 2018.  Tr. 13.

2. The claimant has not engaged in substantial gainful activity since June 13, 2013, the alleged onset date.  Tr. 13.

3. The claimant has the following severe impairments: rheumatoid arthritis, lumbar osteoarthritis, anxiety disorder, and depression.  Tr. 13.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Tr. 14.

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she cannot climb ladders, ropes or scaffolds.  She can occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs.  The claimant can frequently handle and finger bilaterally.  She must avoid concentrated exposure to extreme cold.  She must avoid workplace hazards, such as unprotected heights or exposure to dangerous moving machinery.  The claimant is limited to simple routine tasks that do not involve directing the work of others or being responsible for the safety or welfare of others.  She can do no piece rate work or assembly line work.  Tr. 16.

6. The claimant is unable to perform any past relevant work.  Tr. 20.

7. The claimant was born in 1971 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 20.

8. The claimant has at least a high school education and is able to communicate in English. Tr. 21.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.  Tr. 21.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.  Tr. 21.

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 13, 2013, through the date of this decision.  Tr. 22.

### V. Plaintiff's Arguments

Nicholas argues that the ALJ erred when he considered the opinion of treating physician Dr. Vellanki because he failed to consider all the factors required, failed to acknowledge or discuss exam findings of synovitis, and he overstated Nicholas' daily activities.  Doc. 15.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)).  A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2).[3]  If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for

---

[3] The Code of Federal Regulations governing the Social Security Administration have been updated, but the relevant prior versions govern this case because the ALJ's decision pre-dated the effective date of the regulations.

that weight.  *Wilson*, 378 F.3d at 544.  In deciding the weight given, the ALJ must consider

factors such as the length, nature, and extent of the treatment relationship; specialization of the

physician; the supportability of the opinion; and the consistency of the opinion with the record as

a whole.  *See* 20 C.F.R. § 416.927(c); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th

Cir. 2007).

> The ALJ considered Dr. Vellanki's opinion:

> Padma Vellanki, M.D., one of the claimant's physicians, stated that the claimant could
> work one hour per day, lift ten pounds occasionally, stand for fifteen minutes at a time,
> and sit for thirty minutes at a time (15F/1).  Dr. Vellanki asserted that the claimant could
> occasionally perform postural functions, raise her arms, and perform manipulation with
> her hands (15F/2).  I do not afford controlling weight to Dr. Vellanki's opinion.
> Although she treated the claimant, the exam findings fail to document the extreme degree
> of limitations that Dr. Vellanki described.  Indeed, the claimant's exams showed some
> ongoing joint tenderness, but she generally retained functional range of motion, intact
> strength, and normal gait.  Additionally, the claimant engaged in numerous daily
> activities as described above.  Accordingly, I give little weight to Dr. Vellanki's opinion.

Tr. 20.  Previously in his decision, the ALJ described Nicholas' daily activities:

> The claimant said that she had trouble tending to her personal care, but the record does
> not show any ongoing problems with grooming or hygiene.  She shopped and prepared
> simple meals (3E/4, 5).  She also babysat at times (11F/72).  Moreover, the claimant
> handled her finances and she performed various household chores, including dusting and
> washing clothes (3E/4, 5).

Tr. 15.

Nicholas argues that the ALJ failed to provide good reasons and consider all the factors

described in 20 C.F.R. 404.1527(c)(2).  Doc. 15, p. 14; Doc. 18, pp. 1-4.  However, the fact that

the ALJ did not list all the factors does not mean that he did not consider all the factors.  *See,*

*e.g., Francis v. Comm'r of Soc. Sec.*, 414 Fed. App'x 802, 804 (6th Cir. 2011) (the regulations

provide that an ALJ must consider all the factors and give good reasons, not provide an

"exhaustive factor-by-factor analysis.").  Moreover, although the ALJ did not expressly identify

Dr. Vellanki as treating Nicholas' RA, he referred to her as Nicholas' treating physician and

discussed Dr. Vellanki's treatment notes throughout his decision, including identifying these visits as arthritis check-ups. Tr. 18, 19. Nicholas contends that she saw Dr. Vellanki four times in eleven months prior to Dr. Vellanki's April 2015 opinion and seven times after that. Doc. 15, p. 15; Doc. 18, p. 4. But the ALJ discussed the four visits within 10 months Nicholas had with Dr. Vellanki prior to the April 2015 opinion (Tr. 17 (citing the two May 2014 visits and the October 2014 visit), Tr. 18 (citing the March 2015 visit)), and the ALJ cited and/or discussed the remaining seven visits Nicholas had with Dr. Vellanki after the April 2015 opinion (Tr. 18-19). Nicholas asserts that the ALJ did not consider the medications Dr. Vellanki prescribed and the x-rays she ordered (Doc. 15, p. 16); but the ALJ discussed the medications Nicholas was prescribed (Tr. 19 (Methotrexate, Humira)), and the x-ray findings (Tr. 18). In other words, the ALJ did not ignore the length, specialization, and treatment factors, as Nicholas alleges. Although these precise words do not appear in the paragraph in which the ALJ explains the weight he gave to Dr. Vellanki's opinion, the ALJ's decision amply details this information.

Nicholas argues that the ALJ failed to acknowledge or discuss the findings of synovitis in multiple joints. Doc. 15, p. 16. She details the treatment notes wherein Dr. Vellanki "noted synovitis" in certain of her joints. Doc. 15, p. 17. As an initial matter, Dr. Vellanki's physical exam findings in her treatment notes refer to "swelling"; the diagnosis in her treatment notes refers to "synovitis," a swelling of the synovial membrane in a joint.[4] See, e.g., Tr. 328-329. The ALJ acknowledged that Nicholas was found to have "tenderness with swelling in her hands, arms and legs" and his use of the word "swelling" rather than "synovitis" does not indicate that the ALJ ignored these findings; indeed, these were Dr. Vellanki's own findings. Moreover, the presence of synovitis does not establish a functional limitation; as the ALJ noted, despite exam

---

[4] See Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1858.

findings showing tenderness and swelling, the exam findings also generally showed normal strength, range of motion, and gait, findings that Nicholas does not contest.

Nicholas argues that the ALJ overstated her daily activities. Doc. 15, p. 19. She asserts that the ALJ misconstrues her activities—shopping, preparing simple meals, performing self-care, handling finances, and doing light household chores—because Nicholas stated, at her hearing and in her function report, that she can do some of these things some of the time and at other times she needs help from her husband and daughter. Doc. 15, pp. 19-21. But these are Nicholas' subjective reports regarding the effects of her impairments on her functional abilities, which the ALJ did not entirely credit. Despite Nicholas' assertion that one or more of her joints were regularly locked, i.e., "totally immobile" for about three to four days (Tr. 35), she was regularly found upon exam to have a generally normal range of motion, strength and gait, as the ALJ observed. Tr. 17, 18, 19. Despite her allegations that she cannot move her fingers well and does not do anything with them (Tr. 37), she was regularly found by Dr. Vellanki to have full grip strength, as the ALJ observed. Tr. 18.

Nicholas submits that the ALJ took liberties with a mental health treatment note wherein Nicholas stated that she was going to start babysitting her 2-year old granddaughter twice a week. Tr. 15, 549. Nicholas argues that the ALJ relied on this record to find that Nicholas babysat her granddaughter but later counseling records don't show whether she "actually began babysitting her granddaughter, how long it lasted, whether she had help, or what difficulties she may have experienced while attempting to babysit two times per week." Doc. 15, p. 21. The fact that there is no follow up counseling note does not change the fact that Nicholas had planned on babysitting her 2-year old granddaughter twice a week despite her allegations of quite severe

limitations.  Furthermore, this was one of five activities mentioned and was not the exclusive reason for the ALJ's finding.

Lastly, Nicholas asserts that, even if the ALJ's descriptions of Nicholas' daily activities is accurate, the ALJ did not show that these activities are inconsistent with disability, citing *Gayheart v. Comm'r of Soc. Sec*., 710 F.3d 365, 377-378 (6th Cir. 2013).  Doc. 15, p. 23.  In *Gayheart*, the court found that none of the ALJ's reasons for discounting the treating physician were sufficient, including the claimant's activities of daily living, whereas here, Nicholas' activities of daily living were not the only reason the ALJ cited, and the ALJ's other reason— that Dr. Vellanki's opinion was not supported by her own treatment notes showing functional range of motion, intact strength, and normal gait, is sufficient.  *C.f. Gayheart*, 710 F.3d at 377 ("the ALJ does not identify the substantial evidence that is purportedly inconsistent with [the treating source's] opinions.").  As a whole, the ALJ's decision, including his discussion of Dr. Vellanki's opinion, is supported by sufficient evidence and must, therefore, be affirmed.  *See Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**


IT IS SO ORDERED.


Dated: January 28, 2019

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge